## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **READE WHITNEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:23-cv-02988-JMC** |
| | ) | |
| **DC SOCCER, LLC** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>OPPOSITION TO MOTION TO DISMISS</u>

COMES NOW Plaintiff Reade Whitney, by counsel, pursuant to the Federal Rules of Civil Procedure and the Rules of the United States District Court for the District of Columbia (updated April 2023) and respectfully opposes the Motion to Dismiss filed against the Complaint.

### I.     **Applicable Standard of Review**

The Court is familiar with Rule 12(b)(6) of the Federal Rules of Civil Procedure and the well-established jurisprudence that has developed around it.

> To survive a motion to dismiss under Rule 12(b)(6), a complaint must set forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). When considering a Rule 12(b)(6) motion, we "accept[] as true all of the factual allegations contained in the complaint and draw[] all inferences in favor of the nonmoving party." *Autor v. Pritzker*, 740 F.3d 176, 179, 408 U.S. App. D.C. 42 (D.C. Cir. 2014) (citation and internal quotation marks omitted).

*Bowman v. Iddon*, 848 F.3d 1034, 1039 (D.C. Cir. 2017).  The Court need only take note of the required elements of the cause of action and whether some factual support for them has been pled in the four corners of the Complaint.  *See Norwich Pharms., Inc. v. Becerra*, 2023 U.S. Dist. LEXIS 195879, *26.

A plaintiff only fails to state a claim if he does not plead a plausible claim for relief based on allegations that are entitled to the assumption of truth. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Even post-*Iqbal* and *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, "[t]he notice pleading rules are not meant to impose a great burden on a plaintiff." *Hughes v. Abell,* 794 F. Supp. 2d 1, 6 (D.D.C. 2010).

Under this Court's jurisprudence, the complaint is construed "liberally" and in the plaintiff's favor. *Barr v. Clinton*, 370 F.3d 1196, 1199 (2004). "The Court must grant the plaintiff 'the benefit of all inferences that can be derived from the facts alleged,' but the Court need not 'accept legal conclusions cast in the form of factual allegations.' *Kowal v. MCI Commc'ns. Corp.*, 16 F3d 1271, 1276, 305 U.S. App. D.C. 60 (D.C. Cir. 1994)." *FDR Servs. Corp. of Va. v. District of Columbia*, 2023 U.S. Dist. LEXIS 127203, *2-3.

The instant motion suggests that a different standard should apply to defamation cases, to the extent that "unmeritorious defamation suits" ought to be weeded out. Yet most of the cases Defendant relies on were not rulings on motions to dismiss. The posture of both *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 112 (2017) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 244 (1986) was summary judgment, not a motion to dismiss. The posture of *New York Times Co. v. Sullivan*, 376 U.S. 254, 262 (1964) was post jury trial, not a motion to dismiss. Notably, the Court in *Kahl* noted this focus was "[t]o preserve First Amendment freedoms and give reporters, commentators, bloggers, and tweeters (among others) the breathing room they need to pursue the truth." 856 F.3d at 109 (2017). Here, "Defendant runs a soccer team and is not engaged in the field of journalism." Complaint § 130. There is no different standard.

Regardless, the misguided citations are moot, because the allegations in the Complaint are extensive, robust, and not remotely subject to dismissal as a matter of law.

## II.        Choice of Law

The Motion to Dismiss fails to engage in any choice of law analysis as to what law of

defamation applies.   "According to long-settled precedent, a federal court sitting in diversity

borrows the forum State's choice-of-law rule.  *See Klaxon Co.* v. *Stentor Elec. Mfg. Co.*, 313 U.

S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941)."  *Cassirer v. Thyssen-Bornemisza Collection*

*Found.*, 142 S. Ct. 1502, 1509 (2022).  Here, that is the District of Columbia.

> The District of Columbia uses a choice-of-law scheme called modified-
> government-interest analysis. *See Danziger v. Ford Motor Co.*, 402 F. Supp. 2d
> 236, 239 (D.D.C. 2005); *Washkoviak v. Sallie Mae*, 900 A.2d 168, 180 (D.C. 2006).
> Like traditional government interest analysis, the method seeks to apply the law of
> the jurisdiction most interested in a particular issue.

*Farina v. Sanders*, 2023 U.S. Dist. LEXIS 33203, *10 (2023).  First the court determines whether

there is a conflict of the laws of the competing jurisdictions.  *Id*.  If there is none, the forum law is

applied.  If there is a conflict, the trial court determines which jurisdiction has the most significant

relationship to the dispute considering four factors:

a)  the place where the injury occurred;
b)  the place where the conduct causing the injury occurred;
c)  the domicile, residence, nationality, place of incorporation and place of business of the
    parties; and
d)  the place where the relationship is centered.

*See Washkoviak v. Sallie Mae*, 2006 D.C. App. LEXIS 300, *30.

The law of defamation in the District of Columbia and Virginia are similar but not identical.

Under the law of the District of Columbia, the elements of defamation are (1) that the defendant

made a false and defamatory statement concerning the plaintiff; (2) that the defendant published

the statement without privilege to a third party; (3) that the defendant's fault in publishing the

statement amounted to at least negligence; and (4) either that the statement was actionable as a

matter of law irrespective of special harm or that its publication caused the plaintiff special harm. *Blodgett v. Univ. Club*, 930 A.2d 210, 222 (2007).

The elements of defamation in Virginia are "(1) publication of (2) an actionable statement with (3) the requisite intent." *Schaecher v. Bouffault*, 290 Va. 83, 91 (2015) (quoting *Tharpe v. Saunders*, 285 Va. 476, 480 (2013)).

To the extent that there is a conflict, Plaintiff Reade Whitney resides in Virginia, has suffered greatest injury in Virginia, and is licensed by the Commonwealth of Virginia as an athletic trainer, which is his given profession. Complaint ¶¶ 1, 11, 133, 134. And notwithstanding that DC United plays approximately 17 home league games a year in the District of Columbia, the players and staff spend most of their time in Virginia. Therefore, Virginia law likely applies. Nevertheless, as discussed below, the Motion to Dismiss fails under both Virginia law and District of Columbia law.

### III.    Defamation Law of Virginia

The Supreme Court of Virginia held over 80 years ago that one has a right to an unimpaired reputation, and "an impaired reputation is at times more disastrous than a broken leg. Any violation of these inherent and common rights is an injury to the person for which compensation will lie, either at law or in equity." *Fuller v. Edwards*, 180 Va. 191, 198 (1942).

In Virginia, defamation is shown by a simple preponderance of evidence that the defendant published a statement, that the statement was about the plaintiff, that the statement was made to someone other than the plaintiff, that the statement is false, and that the defendant knew the statement was false or was negligent in ascertaining the facts alleged in the publication. *See e.g. Jordan v. Kollman*, 269 Va. 569, 575 (2005). An "actionable" statement is both false and defamatory. *Tharpe*, 285 Va. at 481.

Furthermore, "[d]efamatory words that cause prejudice to a person in her profession are actionable as defamation per se." *Hyland v. Raytheon Tech. Servs. Co.*, 277 Va. 40, 46 (2009) (citations omitted).   "Defamatory statements may include statements made by inference, implication, or insinuation." *Id.* at 47.   Defamatory words that are actionable per se are:

> 1) Those which impute to a person the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished.

> (2) Those which impute that a person is infected with some contagious disease, where if the charge is true, it would exclude the party from society.

> (3) Those which impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment.

> (4) Those which prejudice such person in his or her profession or trade.

*Tronfeld v. Nationwide Mut. Ins. Co.*, 272 Va. 709, 713 (2006) (quoting *Fleming v. Moore*, 221 Va. 884, 889 (1981)).

Defamatory words are those "tend[ing] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement (Second) of Torts § 559; *see Chapin v. Knight–Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (applying Virginia law).   When characterizing the level of harm to plaintiff's reputation required for defamatory "sting," the Supreme Court of Virginia has stated that defamatory language "tends to injure one's reputation in the common estimation of mankind, to throw contumely, shame, or disgrace upon him, or which tends to hold him up to scorn, ridicule, or contempt, or which is calculated to render him infamous, odious, or ridiculous." *Moss v. Hardwood*, 102 Va. 386, 392 (1904).

Moreover, to the extent defamation must be pled in Virginia using the exact words spoken – in haec verba – the Complaint does so.   *See Fuste v. Riverside Healthcare Ass'n*, 265 Va. 127,

134 (2003).  Paragraph 48 of the Complaint expressly sets out the distinct and verbatim quotations from Defendant's press release, and an image of the press release is included in Paragraph 49 of the Complaint.

> D.C. United have terminated the employment of the club's athletic trainer effective immediately. This termination is the result of an internal review following the discovery of a discriminatory hand gesture made by the individual that surfaced in a photograph published across social media platforms on July 20, 2023.  There is no place for racism, homophobia, misogyny, or discrimination of any kind in our sport world and D.C. United do not tolerate any acts of this nature.

Complaint ¶ 48.

### IV.      The Statements Pled in the Complaint are Actionable under Virginia Law

Defendant published on Friday, July 21 at 7:30 p.m. a "DC United Club Statement" on its website and social media platforms.  Complaint ¶ 46.  The reference to "the club's athletic trainer" could not reasonably refer to anyone other than Reade Whitney, and the Washington Post identified the "club's athletic trainer" as Reade Whitney less than two hours after the publication of the statement.  Complaint ¶ 50-51.

Defendant broadly argues that the statements in the publication are merely opinions, and therefore not actionable.  Actual opinions cannot be true or false by their nature.  But the statements here are not opinions.  "This termination is the result of an internal review following the discovery of a discriminatory hand gesture made by the individual that surfaced in a photograph published across social media platforms on July 20, 2023."  The statement was not that an ambiguous hand gesture had been made.  The statement was not that a discriminatory hand gesture might have been made.  And the statement was not that, in the opinion of DC United, that a discriminatory hand gesture was made.  Whether a discriminatory hand gesture was made by Plaintiff in a photo is either true or false.  Here it is false.

Moreover, while pure expressions of opinion are not actionable, "[f]actual statements made to support or justify an opinion, however, can form the basis of an action for defamation." *Williams v. Garraghty*, 249 Va. 224, 233 (1995). Furthermore, opinions themselves are actionable where they can imply objective facts.

> As the United States Supreme Court noted in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990), "expressions of 'opinion' may often imply an assertion of objective fact." *Id*. at 18. The Supreme Court went on to state, "[s]imply couching . . . statements in terms of opinion does not dispel these implications." *Id*. at 19. Accordingly, the Supreme Court refused to "create a wholesale defamation exemption for anything that might be labeled 'opinion,'" *id*. at 18, instead holding that opinions may be actionable where they "imply an assertion" of objective fact.

*Raytheon Tech. Servs. Co. v. Hyland*, 273 Va. at 303 (2007).

Here, the second sentence of the published statement expressly claimed that "an internal review" was performed. And the statement mentioned the "discovery" of a discriminatory hand gesture. These were all factual assertions and imply unstated objective facts. Defendant publicly told the world that some sort of investigation was conducted which resulted in termination of employment, and that they affirmatively discovered that Plaintiff had made a discriminatory hand gesture. So either Plaintiff did or he did not.

The Complaint squarely and extensively alleges facts showing that Plaintiff did not make a discriminatory hand gesture. He had no knowledge of any such thing. Complaint ¶¶ 36, 40, 41. The Complaint squarely alleges that "[t]he hand gesture used by Reade Whitney in the photograph is literally not the traditional OK gesture that could, as of 2019, be obscurely construed as standing for white power but was instead an upside-down and backwards gesture." Complaint ¶ 78. "The hand gesture used by Reade Whitney in the photograph was specifically held below the waist, which is consistent with the decades old Circle Game." Complaint ¶ 79. These are all factual.

The Complaint also more than sufficiently alleges facts, for example in Paragraphs 53 to 58, that show that the public understood Defendant's statements as having some sort of factual support:

- Comments from the Washington Post article included, "Presumably the league looked into it and found enough evidence to believe he did it and knew what it meant."  Complaint ¶ 53.

- Comments from the Washington Post article included, "Wow, there sure are a lot of people here being VERY offended that a racist got called out for being a racist."  Complaint ¶ 54.

- Comments from the Washington Post article included, "It's your intention that matters. DC United most likely had other indications of this man's intentions. Most innocent folks like yourself have no idea that the sign for ok has been corrupted for a racist trope. Used in an innocent context its taken in an innocent context. 100 bucks says this coach had other marks against him."  Complaint ¶ 55.

- Comments from the Washington Post article included, "Nobody fire somebody for making the OK sign. It had to be the last straw for this guy and he didn't mean it to mean OK."  Complaint ¶ 56.

- Comments from the Washington Post article included, "He should call himself Reade Whiteney!"  Complaint ¶ 57.

- Comments from the Washington Post article included, "(He knew what he was doing and still did it. Now go apply for Qanon's trainer opening.)"  Complaint ¶ 58.

Therefore, even if the Court could find that the "discriminatory hand gesture" statement was somehow a pure opinion, it is still actionable as a matter of law because it does imply objective facts.

The third sentence by Defendant in the club statement regarding Plaintiff, and entitled "D.C. United Terminate Employment of Club Athletic Trainer Effective Immediately," is that "[t]here is no place for racism, homophobia, misogyny, or discrimination of any kind in our sport world…."  This sentence falsely and directly implied that Plaintiff was associated with or supported racism, homophobia, misogyny, and discrimination.  As explained above, these are assertions which imply unstated objective facts.

Furthermore, the Motion to Dismiss fails to address the statements about homophobia and misogyny.  Defendant literally did not have any basis to publish a statement associating Plaintiff with homophobia, which may be manifested in discrimination, hostile behaviour, or hate crimes.[1]  "The actual upright OK hand gesture, even when construed in the obscure, new, and alternative meaning, is not known to be associated with homophobia."  Complaint ¶ 87.  "Reade Whitney has never supported homophobia."  Complaint ¶ 88.  "Reade Whitney is mortified that any of his friends and coworkers in the LGBTQIA+ community may now believe that he was harboring hateful, homophobic, or discriminatory thoughts."  Complaint ¶ 114.  Assertions which imply unstated objective facts are actionable.

Defendant literally did not have any basis whatsoever to suggest that Plaintiff is a misogynist.  "The actual upright OK hand gesture, even when construed in the obscure, new, and alternative meaning, is not known to be associated with misogyny."  Complaint ¶ 89.  "Reade Whitney has never supported misogyny."  Complaint ¶ 90.  "Reade Whitney is mortified that any of his women friends and coworkers may now believe that he was harboring hateful, misogynistic, or discriminatory thoughts."  Complaint ¶ 115.

These are wholesale falsehoods, published on the internet by a major league sports team.  And they are provable.  For example, Plaintiff could be an avowed homophobe, could have published articles or letters premised on an openly anti-gay ideology, or otherwise openly embrace discrimination against homosexuals.  Presumably the current leader of the KKK, or the Aryan Brotherhood, or the American Nazi Party would quickly and proudly acknowledge their beliefs.  Defendant conflates potentially difficulty of proof with unverifiability.

---

[1]  The Oxford Reference defines homophobia as "[n]egative attitudes towards homosexual people and homosexuality which may be manifested in discrimination, hostile behaviour, or hate crimes." https://www.oxfordreference.com/display/10.1093/oi/authority.20110803095943403

There is a final and obvious reason that the statements in this case are actionable.  One of the four defamation per se categories are words "which prejudice such person in his or her profession or trade."  The Supreme Court of Virginia analyzed a case where the trial court had found that an accusation of racism was defamatory per se to a plaintiff in his profession.  "Fleming charged Moore with not wanting blacks to reside within sight of his home, but the allegation of racism was not made in the context of Moore's employment as a teacher."  *Fleming v. Moore*, 221 Va. 884, 891 (1981).  So, the Court ultimately reversed because the claim was outside the context of, and not necessarily hurtful in, plaintiff's profession.

The allegations in the instant Complaint would have comfortably cleared the racism bar to the Court in *Fleming*.  First, the photo that preceded Defendant's wrongful conduct was a photo of Plaintiff at work.  Complaint ¶¶ 28-29.  They are depicted outdoors, wearing shorts, and appear casual, but they are wearing uniforms.  Complaint ¶ 32.  This was a staff photo shoot taken by Defendant and posted by Defendant.  Complaint ¶¶ 28-29.

Second, the accusation of making a "discriminatory hand gesture" and direct implications of racism and discrimination are necessarily hurtful to Plaintiff in his profession and trade.  Plaintiff holds a Bachelor of Science degree in Athletic Training as of 2008.  Complaint ¶ 9.  Plaintiff holds a Master of Science degree in Kinesiology and Rehabilitation Science in Athletic Training as of 2011.  Complaint ¶ 10.  Plaintiff is licensed by the Commonwealth of Virginia as an athletic trainer.  Complaint ¶ 11.  Plaintiff holds seven private licenses and certifications earned between 2008 and 2021 in athletic training and sports medicine.  Complaint ¶ 12.  Plaintiff has been employed as a professional athletic trainer since 2008.  Complaint ¶ 13.  Plaintiff has been employed as a professional soccer athletic trainer since 2013.  Complaint ¶ 14.  Plaintiff has worked for professional soccer teams since 2013.  Complaint ¶¶ 16-17.

Major League Soccer is a workspace with known and reported demographics.  Plaintiff has chosen to dedicate his life to working in the most diverse professional sports league in North America.  Complaint ¶ 18.  Approximately 24% of Major League Soccer players are Black or African American.  Complaint ¶ 19.  And approximately 31% of Major League Soccer players are Hispanic or Latino.  Complaint ¶ 20.  In other words, approximately 55% of the athletes that Plaintiff has worked with on a day to day basis, providing hands on care, therapy, and nutritional and exercise advice, are racial minorities.

Plaintiff has enjoyed a reputation as an excellent, inclusive, and professional soccer athletic trainer since 2013.  Complaint ¶ 15.  Plaintiff enjoyed a reputation as an excellent, inclusive, and professional soccer athletic trainer with the players and staff of D.C. United.  Complaint ¶ 25. Plaintiff enjoyed a reputation as an excellent, inclusive, and professional soccer athletic trainer in the Major League Soccer community, including its 29 clubs, and including players he had worked with in the past who now play for teams other than D.C. United.  Complaint ¶ 26.  Through mid-July of 2023, at the age of 37, Plaintiff was enjoying his trade and profession and looking forward to another three decades of professional level athletic training in soccer.  Complaint ¶ 27.  False statements that Plaintiff made a "discriminatory hand gesture" and implications of trafficking in unarticulated acts of racism and discrimination are necessarily hurtful to Plaintiff in his profession and trade, and constitutes defamation per se.

## V.      The Statements are Actionable under District of Columbia Law

Defendant relies heavily upon *Florio v. Gallaudet Univ.*, 619 F. Supp. 3d 36, 46 (2022), where the defendant's statement that a fraternity had become the "face of systemic racism" was regarded as an opinion.  The Court found that the statement was "her 'subjective view' or 'interpretation' of the fallout from the reappearance of the salute photo on social media and the

controversy over the robes. The phrase 'face of' connotes an inherently subjective assessment and is the sort of 'imaginative expression' and 'rhetorical hyperbole' that typifies non-actionable opinion." *Id.* The case is completely distinguishable.

In *Florio*, a fraternity had continued to use an obviously Nazi-like Bellamy salute for some 50 years after the federal government replaced it with hand over heart for the pledge of allegiance. *Id.* at 36. A photo was taken of four fraternity members in the late 1980's using the by then decades suspect Bellamy salute. *Id.* The photo publicly surfaced in 2016, declarations were made, and then the photo resurfaced in 2020, to renewed attention. *Id.* There was also issues about whether the fraternity would start to again use ceremonial hooded robes, which presumably resembled the well-known KKK outfits. *Id.* There was an investigation. *Id.* The fraternity was suspended for violating a university ban on hooded robes. *Id.* There was thus a series of events, at a university community, over a long period of time. There was much to comment on, much to opine about, and the defendant did.

The Complaint here is almost the converse of *Florio* in a few ways. As published and maintained by the Anti-Defamation League, "Today, in a usage that dates to at least as early as 17th century Great Britain, it most commonly signals understanding, consent, approval or well-being." Complaint ¶ 66. As published and maintained by the Anti-Defamation League, "Since the early 1800s, the gesture increasingly became associated with the word 'okay' and its abbreviation 'ok.'" Complaint ¶ 67. As published and maintained by the Anti-Defamation League, "Use of the okay symbol in most contexts is entirely innocuous and harmless." Complaint ¶ 70. Only recently, and few know it, has an alternate meaning arisen. Complaint ¶ 71-72. In contrast, in *Florio* the salute had been widely known as suspect for 50 years. In *Florio*, the defendant could opine that the plaintiffs had become the faces of racism over a long period of time.

In this case, Plaintiff had been playing the Circle Game in the photograph, which is a schoolyard game dating back to at least the 1970s that involves the upside-down okay hand gesture held below waist level.  Complaint ¶ 75.  As published by the Anti-Defamation League, because of the obscurity and newness of an alternative meaning, the overwhelming usage of the "okay" hand gesture today is still its traditional purpose as a gesture signifying assent or approval.  As a result, someone who uses the symbol cannot be assumed to be using the symbol in either a trolling or, especially, white supremacist context unless other contextual evidence exists to support the contention.  Complaint ¶ 73.  The hand gesture used by Plaintiff in the photograph is literally not the traditional OK gesture that could, as of 2019, be obscurely construed as standing for white power but was instead an upside-down and backwards gesture.  Complaint ¶ 78.  The hand gesture used by Plaintiff in the photograph was specifically held below the waist, which is consistent with the decades old Circle Game.  Complaint ¶ 79.

In this case, Defendant asked Plaintiff about the hand sign, it was not known to Plaintiff nor used as a discriminatory gesture, and Defendant had absolutely no evidence whatsoever to the contrary.  Complaint ¶¶ 36, 40-42, 63, 75-93, 95-98.  In other words, there was nothing to opine about.  Either it was a discriminatory gesture or not.  And literally the orientation, the denial of knowledge, and the absence of any evidence that it was a discriminatory gesture did not create an opportunity to opine, much less in a statement published on the internet by a major league sports team.  There is nothing subjective about the fact that the upside-down version of the OK sign is not the one that has developed an alternative, albeit obscure, meaning.

Indeed, there is another District of Columbia case which deals with the OK sign and which illustrates how the instant Complaint is actionable.  The Motion to Dismiss fails to mention it.  The plaintiff was a journalist who released on the web a photo of herself with another journalist in the

press room at the White House making the OK sign. *Fairbanks v. Roller*, 314 F. Supp. 3d 85, 88 (2018). The defendant, who also was a journalist, retweeted the photo and captioned it "just two people doing a white power hand gesture in the White House." *Id*. The plaintiff sued for defamation. Defendant argued that the statement was opinion and otherwise not actionable. In its opinion, the Court clarified the analysis that directly applies under the facts presented in the instant Complaint and the unavailing attack upon it.

> Ms. Roller's argument about the first *Ollman* factor depends on the mistaken assumption that it is impossible to make a clear statement about an ambiguous gesture.**8** A simple illustration shows the flaw in this logic: People wave in greeting and in parting, but the ambiguity of the gesture does not make the sentence "she waved goodbye" ambiguous or indefinite. Ms. Roller's argument about the second *Ollman* factor relies almost entirely on analogies to statements in other cases about plaintiffs' views or attitudes but does not address the fact that views and attitudes are subjective realities while physical gestures are objective realities.**9**

*Id*. at 91. Just as the ambiguity of a person waving does not make "she waved goodbye" ambiguous, Defendant stating that Plaintiff made a discriminatory hand gesture is not an opinion when there is no (longer) ambiguity.

> Her argument about the third *Ollman* factor suggests that readers would not infer false facts from her tweet but does not address whether her tweet makes a false factual statement directly. … One can imagine situations in which a defendant's characterization of a plaintiff's gesture would be arguably defamatory. For example, a defendant might claim that the plaintiff "flipped me off" when the evidence showed the plaintiff actually gave a thumbs-up, or a defendant might claim that the plaintiff performed the Nazi salute when the plaintiff merely waved hello. These demonstrably false factual statements would differ from related, but protected, statements of opinion such as, "She is a vulgar person," or "He is a Nazi-lover." *Cf. Buckley v. Littell*, 539 F.2d 882, 893-94 (2d Cir. 1976) (distinguishing the factual allegation that a plaintiff was a member of the Communist Party from the statement of opinion that plaintiff is "a fellow traveler of fascism"); *Smith v. Sch. Dist. of Phila.*, 112 F. Supp. 2d 417, 429 (E.D. Pa. 2000) (holding that general accusations of being "racist and anti-Semitic" state opinion and not fact). While the allegation that Ms. Fairbanks displayed a "white power gesture" is arguably more ambiguous than an allegation that the plaintiff flipped someone off or performed the Nazi salute, this ambiguity is not clearly fatal to her suit against Ms. Roller.

*Id*. 91-92.  Nor is there anything fatal to Plaintiff's valid claim for defamation here.

The Motion to Dismiss goes on to selectively cite cases from multiple jurisdictions in its effort to claim that the statements published by Defendant about Plaintiff are merely opinion.  The various cases are largely either fact patterns where genuinely subjective opinions are rendered, or cases which conflate the difficulty of proving state of mind in some contexts with impossibility of doing so, or both.  As discussed in *Fairbanks*, the reasoning is deeply flawed.

And of course there are plenty of cases where, like in Virginia, topics related to racism are not prohibitive of a defamation claim.  A relatively recent case where implications of unstated facts surrounding claims of false statements of racism (which is a far less robust fact pattern than this case) was allowed to proceed.

> Given the public's lack of knowledge of what had happened at the bakery and the ongoing tension on campus about racial injustice, these statements would convey to a reasonable reader that the arrest and alleged assault at the bakery were racially motivated, that the Gibsons had a verifiable history of racially profiling shoplifters on that basis for years, and that those facts were a reason to boycott the bakery. The trial court did not err in concluding, as a matter of law, that these were actionable statements of fact, not constitutionally protected opinion. Consequently, it did not err in denying Oberlin's motion for JNOV on this basis.

*Gibson Bros. v. Oberlin Coll*., 2022-Ohio-1079, P37

> Oberlin broadly defines the controversy in this case to be what it alleges is a history of racism at the bakery. The proper focus of this inquiry, however, is on the controversy from which the alleged defamation arose: the incident at the bakery on November 9, 2016. *See Woods v. Capital Univ.*, 10th Dist. Franklin No. 09AP-166, 2009-Ohio-5672, ¶ 36. The Gibsons did not voluntarily inject themselves into a shoplifting incident at their bakery, nor did they voluntarily inject themselves into extreme public criticism of their employee's efforts to apprehend and detain the shoplifter. Oberlin has failed to demonstrate that the trial [***34]  court erred in concluding, as a matter of law, that the Gibsons were private figures

*Gibson Bros. v. Oberlin Coll*., 2022-Ohio-1079, P61.

**VI.**      **Plaintiff is Not a Limited Purpose Public Figure**

Defendant argues that Plaintiff is a limited purpose public figure, that therefore he must allege malice, and that the Complaint did not allege malice.  Defendant is wrong.  Plaintiff is not a public figure.  Complaint ¶131.  And under federal, Virginia, and DC law Plaintiff is not a limited purpose public figure.

The Supreme Court of the United States addressed public figures and limited purpose public figures in *Gertz v. Robert Welch*:

> In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts.  More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.  In either case such persons assume special prominence in the resolution of public questions.

*Gertz v. Robert Welch*, 418 U.S. 323, 351 (1974).  In that case the Court ruled that the plaintiff, who was a lawyer, was not a public figure where he "played a minimal role at the coroner's inquest, and his participation related solely to his representation of a private client.  He took no part in the criminal prosecution of Officer Nuccio."  *Id*. at 352.  The plaintiff "plainly did not thrust himself into the vortex of this public issue, nor did he engage the public's attention in an attempt to influence its outcome. We are persuaded that the trial court did not err in refusing to characterize petitioner as a public figure for the purpose of this litigation." *Id*.

The Supreme Court of Virginia expressly relied upon *Gertz* and other Supreme Court cases in considering and deciding *Fleming v. Moore*, 221 Va. 884, 892 (1981).  The Court determined that the plaintiff was not a limited purpose public figure.  The plaintiff in *Fleming* had spoken twice in public hearings concerning a real estate development proposal and had "resorted to an administrative body in order to protect the value of his own residence."  *Id*.  The Supreme Court of Virginia concluded "that he was not a public figure. Therefore, he was not required to show, as

a prerequisite to recovery of compensatory damages, that Fleming acted with malice that met the *New York Times* standard." *Id.*

Here, contrary to the suggestion in the Motion to Dismiss, Plaintiff did not inject himself into any public controversies. This was a staff photo shoot taken by Defendant and posted by Defendant. Complaint ¶¶ 28-29. Plaintiff did not post the photo. Plaintiff did not publish it.

Plaintiff had no idea that any public controversy existed at all. Plaintiff was surprised to hear that anyone thought that any variation of the OK hand gesture could be construed as a racist one. Complaint ¶ 36. Plaintiff explained that he did not know before that day that any variation of the OK hand gesture could be construed as a racist or white power signal. Complaint ¶ 40. Plaintiff had been playing the Circle Game in the photograph, which is a schoolyard game dating back to at least the 1970s that involves the upside-down okay hand gesture held below waist level. Complaint ¶ 41, 75. The hand gesture used by Plaintiff in the photograph is literally not the traditional OK gesture that could, as of 2019, be obscurely construed as standing for white power but was instead an upside-down and backwards gesture. Complaint ¶ 78. And the hand gesture used by Plaintiff in the photograph was specifically held below the waist, which is consistent with the decades old Circle Game. Complaint ¶ 79. Plaintiff was playing a game which he occasionally played with multiple D.C. United players and staff. Complaint ¶ 42.

The Motion to Dismiss cites to *Shive-Ayala v. Pacelle*, 2022 U.S. Dist. LEXIS 46210 for its argument that Plaintiff is colorably a limited purpose public figure. The facts are remarkably different. The plaintiff in *Shive-Ayala* raised and sold pure-bred fowl for cockfighting, and she had admitted having been involved in the sport for 30 or 31 years. *Id.* *2. Her farm had 1200 to 1600 gamefowls and she maintained five pure blood lines." *Id.* She had given multiple interviews, had been quoted, and there were videos circulating of the interviews she participated in. Id. *3-4.

The defendant in *Shive-Ayala* argued that the plaintiff was a limited purpose public figure because:

> (1) cockfighting is the subject of "a broad public controversy," MTD at 22; (2) "Shive-Ayala has sought and established a prominent place in the public discussion of cockfighting," MTD at 27; and (3) the "statements are based directly on Shive-Ayala's own repeated admissions of her involvement in cockfighting," MTD at 30.

*Id.* *8-9. The defendant conceded the first and third factor. The Court found against the plaintiff on the second factor because she had "embraced media coverage as an opportunity not only to advertise her fowl, but also to speak to the merits of and her involvement in the sport of cockfighting" (*id.* at 11) and "treated media attention as an avenue for advocacy—not merely an advertising campaign to sell her birds" (*id.* at 12) and otherwise drew attention to herself to create public discussion (*id.* at 13). This case does not remotely share any of these characteristics.

The Motion to Dismiss cites to *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 585 (2016) with regard to the utility of a three-part inquiry. First, the court identifies a relevant controversy and determines whether it is a public one. Ironically, there is no genuine controversy, so much as an obscure hoax. As published and maintained by the Anti-Defamation League, "Use of the okay symbol in most contexts is entirely innocuous and harmless." Complaint ¶ 70. As published and maintained by the Anti-Defamation League, sometime in 2017 the okay hand gesture was given a new meaning as part of a hoax by white supremacists who joked that the hand gesture represented the letters WP to signify "white power." Complaint ¶ 71. As published and maintained by the Anti-Defamation League, by 2019 some white supremacists abandoned this satirical use of the okay gesture and began to use it without irony, leading the Anti-Defamation League to identify the hand gesture as a potential hate symbol. Complaint ¶ 72. Nevertheless, as published and maintained by the Anti-Defamation League because of the obscurity and newness of this alternative meaning:

> The overwhelming usage of the "okay" hand gesture today is still its traditional purpose as a gesture signifying assent or approval. As a result, someone who uses the symbol cannot be assumed to be using the symbol in either a trolling or, especially, white supremacist context unless other contextual evidence exists to support the contention. Since 2017, many people have been falsely accused of being racist or white supremacist for using the "okay" gesture in its traditional and innocuous sense.

Complaint ¶ 73.

Second Plaintiff must have played a significant role in that controversy, if there is one. Here, as discussed above, Plaintiff had no knowledge of the hoax, no knowledge of any purported controversy, and was literally playing a child's game. The only way Plaintiff could have been thrust into any such controversy is the very act sued upon here – because and resulting from Defendant publishing a club statement with false statements about Plaintiff. There is no basis in the Complaint to argue that Plaintiff played any role in any controversy before Defendant's act.

Third, the defamatory statement must be germane to the plaintiff's participation in the controversy. Once again, as pled and as must be accepted under the Rule 12(b)(6) standard, Plaintiff was playing a game, such that Plaintiff was not participating in any controversy. Indeed, everything pled in the Complaint only dictates that Plaintiff would never have made a discriminatory hand signal. Plaintiff has no history of racist conduct. Complaint ¶ 80. Plaintiff has no history of racist associations. Complaint ¶ 81. Plaintiff has no history of racist readings or writings. Complaint ¶ 82. Plaintiff has no history of white supremacist conduct. Complaint ¶ 83. Plaintiff has no history of white supremacist associations. Complaint ¶ 84. Plaintiff has no history of white supremacist readings or writings. Complaint ¶ 85. Plaintiff's wife is not white. Complaint ¶ 86. Plaintiff has never engaged in discriminatory acts. Complaint ¶ 91. Plaintiff has never supported discriminatory acts. Complaint ¶ 92. Plaintiff is an avowed lifelong anti-racist. Complaint ¶ 93.

Plaintiff cannot be plausibly characterized as a limited purpose public figure under the jurisprudence and the facts alleged in the Complaint.  Actual malice does not need to be pled.

**V.       Plaintiff Pled Actual Malice**

Even if Plaintiff was somehow construed as a limited purpose public figure, the Complaint pleads facts that support any required malice or its equivalent under both Virginia law and District of Columbia law.

In Virginia, a plaintiff must further prove "that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement."  Jordan v. Kollman, 269 Va. 569, 577 (2005).  The District of Columbia applies the same standard, such that Plaintiff must show that Defendant made the statement with the knowledge that the statement was false or with reckless disregard of whether the statement was false or not.  *Tah v. Global Witness Publ., Inc*., 991 F.3d 231, 240 (2021) (citations omitted).

As a preliminary matter, while not a substitute for the forthcoming recitation of factual allegations, the Complaint repeatedly placed Defendant on notice that it was pleading malice. "Defendant's conduct in publishing the statement was outrageous."   Complaint ¶ 117. "Defendant's publication was made with knowledge that the statements were false or with reckless disregard of whether they were false or not."  Complaint ¶ 118.   And "Defendant's publication, which was completely unnecessary and hurtfully false, demonstrated ill will and malice toward Reade Whitney."  Complaint ¶ 119.  D.C. United published the statements knowing that they were false or made them so recklessly as to amount to a willful disregard for the truth, that is, with a high degree of awareness that the statements were probably false.  Complaint ¶ 154.  To the extent that a Motion to Dismiss challenges whether Defendant has been adequately placed on notice, that is satisfied here.

The Complaint pleads an abundance of facts, all of which are accepted as true for purposes of Rule 12(b)(6), which support that Defendant's publication was made with knowledge that the statements were false or with reckless disregard of whether they were false or not.  The only part of the statement published by Defendant that was not demonstrably false was that D.C. United had terminated Plaintiff's employment effective immediately.  Complaint ¶ 94.  D.C. United could not have conducted any kind of remotely legitimate, thorough, or good faith investigation in less than two hours on a Friday evening.  Complaint ¶ 95.  D.C. United did not conduct any kind of remotely legitimate, thorough, or good faith investigation in less than two hours on a Friday evening.  Complaint ¶ 96.  D.C. United could not identify any evidence whatsoever from any interviews in that limited window that Plaintiff had any racist, white power, or discriminatory background or intent.  Complaint ¶ 97.  D.C. United could not identify any evidence whatsoever from any interviews in that limited window that Plaintiff had made a discriminatory hand gesture.  Complaint ¶ 98.

Even performing a simple Google search would have shown in a few minutes that D.C. United was completely off track.  Complaint ¶ 99.  A simple Google search would have revealed that the Anti-Defamation League warns that the use of the OK symbol in most contexts is entirely innocuous and harmless.  Complaint ¶ 100.  A simple Google search would have revealed that the U.S. Military Academy at West Point and the Naval Academy each conducted a several day investigation of cadets seen using the OK hand gesture at an Army-Navy football game and each concluded that it was just the Circle Game.  Complaint ¶ 101.  A simple Google search would have revealed that D.C. Fire and EMS had conducted a two-week investigation of recruits photographed using the OK hand gesture and concluded that it was just the Circle Game.  Complaint ¶ 102.  At

minimum, D.C. United failed under the circumstances to take care that its statements about Plaintiff were true.  Complaint ¶ 103.

Even if D.C. United had chosen to abruptly terminate Plaintiff's employment on any grounds, with or without justification, there was no legitimate reason to publish any statement on their website and social media platforms.  Complaint ¶104.  D.C. United has forever falsely linked Plaintiff to "racism, homophobia, misogyny, [and] discrimination."  Complaint ¶ 105.  D.C. United has destroyed Plaintiff's reputation in his community of professional soccer through their false publications.  Complaint ¶ 106.  D.C. United has destroyed Plaintiff's ability to earn a living in his given trade and profession of athletic training.  Complaint ¶ 107.  D.C. United has destroyed Plaintiff's ability to earn a living in any trade or profession, as a Google search by any potential employer will link him to these false claims.  Complaint ¶ 108.  When confronted with their conduct, D.C. United refused to publish a retraction of any of their false statements.  Complaint ¶ 109.  The D.C. United Club Statement remains posted on the website.  Complaint ¶ 116.

A prominent D.C. United player had been accused of making racist statements on July 15, 2023, for the second time within a year, this time against a teammate instead of against an opponent, and Defendant was embarrassed by the scandal.  Complaint ¶¶ 120-121.  D.C. United cynically took Plaintiff's innocent hand gesture as an opportunity to portray itself as making a public statement against racism while the investigation played out and the accused player was on administrative leave.  Complaint ¶ 122.

D.C. United had no interest or duty in making its published false statements about Plaintiff. Complaint ¶ 153.  D.C. United has not offered nor made any apology to Plaintiff for their published statements regarding him.  Complaint ¶ 155.  All of these factual allegations, accepted as true for this motion, are more than sufficient to plead any required malice.

WHEREFORE, Plaintiff Reade Whitney respectfully asks the Court to deny the overreaching and meritless Motion to Dismiss.


Dated: November 16, 2023                    Respectfully submitted,

                                            CHARNOFF SIMPSON PLLC


                                            _____/s/ Mikhael D. Charnoff_____
                                            Mikhael D. Charnoff (#476583)
                                            111 Church Street, NW, Suite 202 A
                                            Vienna, VA 22180
                                            P:  703-291-6650
                                            mike@charnoffsimpson.com
                                            *Counsel for Plaintiff*


## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2023, I caused a copy of the foregoing to be served electronically on counsel for Defendant DC Soccer, LLC, Daniel E. Farrington of Fisher & Phillips LLP, by using the CM/ECF system of the United States District Court of the District of Columbia.

                                            CHARNOFF SIMPSON PLLC


                                            _____/s/ Mikhael D. Charnoff_____
                                            Mikhael D. Charnoff (#476583)
                                            111 Church Street, NW, Suite 202 A
                                            Vienna, VA 22180
                                            P:  703-291-6650
                                            mike@charnoffsimpson.com
                                            *Counsel for Plaintiff*