# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **READE WHITNEY,** | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| v. | )    Case No. 1:23-cv-02988-JMC |
| | ) |
| **DC SOCCER, LLC** | ) |
| | ) |
|     **Defendant.** | ) |

## JOINT STATUS REPORT

The parties jointly file this Status Report, with reference to the Court's August 30, 2024 Minute Order, to advise the Court that the United States Court of Appeals for the D.C. Circuit has published its decision in *Florio v. Gallaudet University* on October 4, 2024, and a courtesy copy is attached for reference.


Dated: October 7, 2024				Respectfully submitted,


    /s/ Mikhael D. Charnoff			    /s/ Daniel E. Farrington
Mikhael D. Charnoff (#476583)			Daniel E. Farrington (#471403)
CHARNOFF SIMPSON PLLC			Fisher & Phillips LLP
111 Church Street, NW, Suite 202 A		1401 New York Avenue, NW, Suite 400
Vienna, VA 22180				Washington, DC 20005
P:  703-291-6650				(202) 429-3706
mike@charnoffsimpson.com			dfarrington@fisherphillips.com
*Counsel for Plaintiff*				*Counsel for Defendant*

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued November 17, 2023      Decided October 4, 2024

No. 22-7117

MICHELLE FLORIO, AS PERSONAL REPRESENTATIVE OF THE
ESTATE OF STEVEN FLORIO, DECEASED, ET AL.,
APPELLANTS

v.

GALLAUDET UNIVERSITY, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cv-01565)

---

    *Christopher E. Mills*, appointed by the court, argued the cause and filed the supplemental briefs as *amicus curiae* in support of appellants.

    *Clifford J. Zatz* argued the cause and filed the supplemental brief for appellees Gallaudet University, et al.

    *Nicholas G. Gamse* argued the cause for appellee WP Company, LLC. With him on the supplemental brief were *Thomas G. Hentoff*, *Anna Johns Hrom*, and *Mary E. Goetz*.

2

Before: HENDERSON and KATSAS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

Concurring opinion filed by *Circuit Judge* HENDERSON.

KATSAS, *Circuit Judge*: In 1989, thirty-four members of the Kappa Gamma fraternity at Gallaudet University were photographed together performing the Bellamy salute, which was created in the late 19th century for the Pledge of Allegiance. Unfortunately, it now also resembles the Nazi salute. Thirty years after the photograph was taken, the president of Gallaudet, referencing it, described Kappa Gamma as the "face of systemic racism" at Gallaudet. The *Washington Post* republished this statement and described the photograph as depicting "anti-Semitic" behavior and a "Nazi salute."

The plaintiffs here are three alumni of Gallaudet's Kappa Gamma chapter, and the estate of a fourth who passed away while this litigation was pending. Two of the alumni appeared in the 1989 photograph. All four sued Gallaudet and the *Post* for defamation and related torts. The district court dismissed the complaint on the grounds that none of the disputed statements concerned the plaintiffs, and many of them were not actionable.

We disagree in part, but nonetheless affirm. We conclude that the statements about the photograph concerned the individuals who were in it. But we agree with the district court that those statements were protected opinions.

3

I

A

Gallaudet University is the oldest university in the United States organized to provide higher education to the deaf. Over the last several years, it has faced controversies on various matters related to race. So too have its fraternities.

Some of the controversies have involved fraternities' use of the Bellamy salute and ceremonial robes. Francis Bellamy wrote the Pledge of Allegiance and created the salute for use while reciting it. The salute is performed by holding the right arm fully outstretched at an upward angle. It was widely used in the United States beginning in 1892. But it resembles the salutes adopted by fascist Italy in the 1920s and Nazi Germany in the 1930s. So in 1942, Congress amended the Flag Code to provide that the Pledge should be performed not with a Bellamy salute, but "with the right hand over the heart." 4 U.S.C. § 4; *see* Pub. L. No. 77-623, § 7, 56 Stat. 377, 380. In 2015, Gallaudet prohibited fraternities from wearing robes at public events because of their resemblance to garb worn by the Ku Klux Klan. Gallaudet did not prohibit the salute.

Kappa Gamma is the oldest fraternity at Gallaudet. It used the Bellamy salute as an organizational rite from 1901 until the early 1990s. In 1989, thirty-four of its student members were photographed performing the salute. In the photograph, students of assorted races appear roughly organized in three rows, with the front row seated and the back row standing. They all appear facing the camera, posing for the photograph, not wearing robes, and performing the salute in unison. The photograph has appeared on the Internet since at least 2016. Kappa Gamma members wore ceremonial robes on other occasions from 1904 until their prohibition in 2015.

4

B

In the spring of 2020, Gallaudet experienced increased racial unrest following the death of George Floyd. During that time, the salute photo resurfaced online. On June 5, Roberta Cordano, the president of Gallaudet, met with the Student Body Government and Black Student Union to discuss complaints about Gallaudet's hiring practices, police officers, and culture.

On June 9, Cordano published a YouTube video announcing the suspension of Kappa Gamma. She communicated in American Sign Language (ASL). The parties dispute what is the most accurate translation of her signing into written English. The alumni claim that she said:

> During the past few days, starting with the SBG/BSU Town Hall Meeting last Friday, we received new information that led to many people calling for attention to Kappa Gamma, one of Gallaudet's long established fraternities. Kappa Gamma, pictures distributed on social media of their use of hooded robes and of the salute, they have become the *face of systemic racism*. This behavior is unacceptable.

J.A. 32 (cleaned up) (emphasis added). While making this statement, Cordano performed what the alumni describe as a "version of a Bellamy salute" that gave the "appearance" of a Nazi salute. *Id.* at 34.

In a later video posted in July, Cordano clarified that Kappa Gamma was "not suspended because of old photos," but based on "new evidence" of its "intention to bring back the use of robes." J.A. 44. She also stated that although "Kappa Gamma used robes and a salute that is racist," no one "person

5

or group" was solely responsible "for the systemic racism at Gallaudet." *Id.* at 45.

The *Washington Post* covered the story of Kappa Gamma's suspension in three articles. Two online pieces began with the headline "Gallaudet University suspends fraternity after anti-Semitic photo resurfaces." J.A. 89, 105. The one in print began with a large headline "Gallaudet suspends its oldest fraternity" followed by a smaller headline: "Photos involving Nazi salute, KKK-style garb seal Kappa Gamma's fate." *Id.* at 108. The articles referenced "recent photos" of Kappa Gamma members wearing "prohibited" robes "with pointed hoods." *Id.* at 105, 108. And they mentioned an "older photo," which assertedly showed "former members … performing an apparent Nazi salute." *Id.* at 89, 105, 108. The print version of the story and the updated online version, but not the original online version, clarified that the old salute photo "was not a factor in the suspension." *Id.* at 105, 108. After stating that "the return of the fraternity's robes reignited demands for change within an organization that has previously been accused of anti-Semitism and racism," the articles quoted Cordano's "face of systemic racism" charge, as translated in Gallaudet's official transcript of her signed video: "They have become the face of systemic racism in our community, with photographs of the salute and use of robes being shared on social media. This behavior is unacceptable." *Id.* at 90–91, 105, 109 (articles); *see also id.* at 76 (transcript).

C

The plaintiffs are four Gallaudet alumni who were student members of Kappa Gamma in the late 1980s or early 1990s. Two of them, Patrick Costello and William Millios, appeared in the 1989 photograph of the Bellamy salute. The other two, Steven Florio and Timothy Mallach, neither appeared in the

6

photograph nor were even Kappa Gamma members when it was taken, although Florio asserted that he was misidentified by third parties as appearing in the photo. All four sued Gallaudet (including its board of trustees and Cordano) and the *Post* for the statements summarized above.

The alumni assert various defamation claims. They allege that Cordano defamed them by calling them the "face of systemic racism" and suggesting that they had performed a Nazi salute. They allege that the *Post* defamed them by republishing Cordano's "face of systemic racism" statement, labeling the salute photo "anti-Semitic," referring to the salute as a "Nazi salute," and connecting the photo to the robe controversy. They also argue that both sets of defendants implied that additional unflattering information or photographs existed.

The alumni allege that they suffered severe reputational and financial harms from the insinuations of racism, anti-Semitism, and Nazi sympathizing. Moreover, they say, these harms were made worse by their positions in a tight-knit deaf community where "everybody knows everybody." J.A. 11. Costello alleges that he was forced to resign by a school for the deaf where he had worked for 23 years and that he has been unable to find new employment. *Id.* at 63. Millios alleges that he was fired by the Registry of Interpreters for the Deaf, where he had worked for seven years, and that he has been unable to find new employment. *Id.* at 65. Florio (who passed away while this appeal was pending) alleged that he was fired as a commissioner on the Massachusetts Commission for the Deaf and Hard of Hearing, was forced to move to Florida, and was unable to find new employment. *Id.* at 60–61. Mallach alleges that he was forced to resign from a school for the deaf where he had worked for two decades and has been unable to find new employment. *Id.* at 67.

7

The district court dismissed the complaint for failure to state a claim. *Florio v. Gallaudet Univ.*, 619 F. Supp. 3d 36 (D.D.C. 2022). It concluded that "none of [the] challenged statements concern the individual plaintiffs, and others are also either non-actionable statements of opinion or concededly true." *Id.* at 40. The alumni appealed.[1]

II

We review *de novo* a dismissal for failure to state a claim. *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 685 (D.C. Cir. 2023). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). In other words, the complaint must allow a "court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

To state a defamation claim under D.C. law, a plaintiff must plausibly allege:

> (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement met the requisite standard; and (4) either that the statement was actionable as a

---

[1] While the appeal was pending, the plaintiffs' counsel passed away, and we appointed Christopher Mills as *amicus curiae* to brief and argue in support of the plaintiffs. Mr. Mills has ably discharged his duties, and the Court thanks him for his service.

8

matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

*Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1240 (D.C. 2016) (cleaned up).  The only disputed issues here are whether the statements at issue concerned the plaintiffs and whether they were actionable.

A

To plausibly allege that the statements at issue concerned them, plaintiffs must show "that a 'reasonable listener' could think that [the defendants were] referring to [them]." *Browning v. Clinton*, 292 F.3d 235, 247 (D.C. Cir. 2002).  The district court held that "the challenged statements are about Gallaudet's Kappa Gamma chapter as a whole, not about any one member."  *Florio*, 619 F. Supp. 3d at 45.  We agree as to the statements not specifically about the photograph.  But we conclude that the statements about the photograph concerned the two plaintiffs who appeared in it.

1

a

The alumni plausibly allege that a reasonable viewer or reader could think the defendants' statements about the salute photograph referred to them as individuals.  These include Cordano's "face of systemic racism" statement and her suggestion that the photo depicted a Nazi salute, as well as the *Post*'s similar statements and its characterization of the photo as "anti-Semitic."

The parties dispute to whom Cordano was referring when she allegedly stated that "Kappa Gamma, pictures distributed on social media of their use of hooded robes and of the salute,

9

*they* have become the face of systemic racism. This behavior is unacceptable." J.A. 32 (cleaned up) (emphasis added). Cordano contends that her "face of systemic racism" comment referred only to Kappa Gamma itself—and *not* to the individuals in the salute photo. The referent of a particular statement is a question of fact. *See Atkins v. Indus. Telecomms. Ass'n, Inc.*, 660 A.2d 885, 893 (D.C. 1995). So at this stage of the litigation, we consider only whether the alumni's reading of Cordano's statement is plausible. We must also accept what the alumni allege to be the most accurate translation of her remarks from ASL into English. And in construing the statement, we must accept the alumni's allegation that the 1989 salute photograph was the only widely distributed photo of Kappa Gamma members performing the salute and that there were no photos of members wearing robes. J.A. 35.

Given these assumptions, we conclude that Cordano's statement plausibly refers to the individuals in the photograph as well as to the fraternity itself. For one thing, her statement focuses on "behavior" such as a "salute," which most naturally denotes that individuals are performing it. Moreover, this case involves a disputed translation from ASL into English, and no translation may perfectly capture what Cordano conveyed. As the amicus stresses, the rules of English grammar have only limited utility here because ASL "uses a different system of syntax" from spoken English. Belt, *American Sign Language is Not English on the Hands*, ASL University (July 18, 2013) (cleaned up). The meaning of individual words depends heavily on context, and entire categories of English words, such as articles, simply do not exist in ASL. *See id*. Given a disputed translation and a plausible English reading that favors the plaintiffs, we cannot rule out the alumni's interpretation as a matter of law at this stage. And if Cordano's "face of systemic racism" statement referred to the individuals in the salute photograph, then so did her implication that they

10

performed a Nazi salute. These statements plausibly refer to Costello and Millios, who appear in the photograph.

The *Post* published Cordano's "face of systemic racism" statement as reflected in an official transcript of her signed comments. In this version of the statement, Cordano described recent controversies involving Kappa Gamma and then said: "They have become the face of systemic racism in our community, with photographs of the salute and use of robes being shared on social media. This behavior is unacceptable." J.A. 90–91, 105, 109. Again, the invocation of photographs to contend that a fraternity has become a "face" of systemic racism calls attention to the photographed individuals—at least if, as the alumni argue, there is only one, notorious salute photograph. Moreover, the *Post* article discusses the salute controversy at some length, which again focuses attention on the students in the referenced salute photo. Likewise, so do the *Post*'s characterizations of the photograph as "anti-Semitic" and as depicting a "Nazi salute."

But statements about the salute photograph do not refer to Florio or Mallach. Again, this inquiry focuses on whether a "reasonable" person could think that Cordano or the *Post* was referring to him. *Browning*, 292 F.3d at 247. Florio alleges that he was incorrectly identified as appearing in the photograph. But he was *not* in it, and he alleges no facts supporting a plausible inference that he was *reasonably* misidentified even though he was not even a member of Kappa Gamma when the photo was taken. Mallach's argument is even weaker. He did not appear in the photograph, nor does he allege a misidentification.

b

Gallaudet and the *Post* raise two counterarguments. First, they argue that neither Cordano nor the *Post* republished the

11

salute photograph, so many who viewed or read their statements would not know who was pictured. But that does not absolve them. "[I]t suffices that the statements at issue lead the listener to conclude that the speaker is referring to the plaintiff by description, even if the plaintiff is never named or is misnamed." *Croixland Props. Ltd. P'ship v. Corcoran*, 174 F.3d 213, 216 (D.C. Cir. 1999). Here, Costello and Millios alleged facts plausibly supporting a conclusion that some viewers identified them as individuals in the photograph and reasonably understood the statements as referring to them. They allege that they did appear in the photograph, that it was widely distributed within the deaf community, that they suffered backlash within "hours, if not minutes" of Cordano's signed statement, and that they lost longstanding jobs as a result. J.A. 41–43, 62–66. That is more than enough to plead that these statements concerned them.

Second, Gallaudet and the *Post* raise legal arguments why, even if the statements about the salute photograph referred to the individuals in it, none of them may assert defamation claims. The *Post* contends that an individual has no claim unless a defamatory statement makes specific reference to him or her. And both defendants contend that when a speaker refers to a group of 34 individuals, the group is too large to support claims by the individuals. We disagree on both counts.

Ordinarily, defamatory "statements which refer to an organization do not implicate its members." *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1089 (D.C. Cir. 2007) (cleaned up). But "[w]hen a statement refers to a group, a member of that group may claim defamation if the group's size or other circumstances are such that a reasonable listener could conclude the statement referred to each member." *Browning*, 292 F.3d at 247. As we have explained, the statements about the salute photograph may refer to each individual in it. And

Case 1:23-cv-02988-JMC   Document 13   Filed 10/07/24   Page 13 of 19
USCA Case #22-7117   Document #2078290   Filed: 10/04/2024   Page 12 of 18

12

despite the *Post*'s contrary contention, there is no further requirement that the defendant specifically refer to each plaintiff individually.

Consider *Service Parking Corp. v. Washington Times Co.*, 92 F.2d 502 (D.C. Cir. 1937), a decision that the D.C. Court of Appeals treats as a binding precedent of D.C. law, *see M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971). In *Service Parking*, a newspaper published an article suggesting that parking lot operators in a certain downtown area had engaged in unlawful activity. 92 F.2d at 503. At the time, there were "twenty to thirty parking lots … operated by ten or twelve owners" in that area. *Id.* We stated this test for whether the statements at issue "referred to" the plaintiff: "Where the words reflect on each and every member of a certain number or class, each or all can sue." *Id.* at 504 (quoting Odgers, Libel and Slander 124–25 (6th ed. 1929)). Applying that rule, we held that the article did not refer to the individual plaintiffs. Because the article contained no language mentioning any "ascertainable person," and because the class was not "so small" that a statement about the group necessarily applied to each member, we held that the article "could not reasonably be said to concern more than downtown parking lots and their owners as a class." *Id.* at 506 (cleaned up). Nonetheless, if the persons referenced were "ascertainable," *Service Parking* dictates that those persons could sue for defamation. *Id.*

In response, the defendants cite *Fowler v. Curtis Publishing Co.*, 182 F.2d 377 (D.C. Cir. 1950). There, the owner of a fleet of taxi cabs, on behalf of himself and 59 drivers, sued a newspaper over a satire portraying D.C. cab drivers as dishonest. *Id.* at 377–78. Holding that the plaintiff had not stated a claim, we concluded that "in case of a defamatory publication directed against a class, without in any way identifying any specific individual, no individual member

13

of the group has any redress." *Id.* at 378. But *Fowler* is consistent with *Service Parking*. A generalization about D.C. cab drivers is not a statement about each driver. In both cases, the allegedly defamatory statements referred only to the class as a whole, and context prevented any reasonable inference that the statement applied to each individual member.

In this case, each of the individuals in the photo is readily identifiable because all of their faces are visible. And statements about the salute plausibly refer to all of them because they were all performing the salute in unison. Because the disputed statements about the photograph reflect on "each and every" individual in it, the statements concern those individuals. *See Service Parking*, 92 F.2d at 504.

The defendants also object that defamatory statements about a group of 34 people cannot support individual claims because the group is simply too large. But the size of a group matters only as a contextual consideration bearing on whether a statement about the group can fairly be understood as a statement about all of its members. For very large groups, such universal application is highly unlikely. A statement that "Kappa Gamma members are anti-Semitic," like a statement that "D.C. cab drivers are dishonest," cannot reasonably be understood as referencing each member of the group. *See Fowler*, 182 F.2d at 377–78. In contrast, a statement about a marital couple surely references both of its members. But regardless of the group's size, the key question is whether a statement about a group "refer[s] to some ascertained or ascertainable person." *Service Parking*, 92 F.2d at 506 (cleaned up).

Here, statements about the group plausibly refer to its individual members. In the abstract, it is hard to say whether statements about a group of 34 individuals should be attributed

14

to each individual member. But here, the group consists of individuals posing for a photograph with a ritualized gesture that is its defining feature. As we have explained, it is at least plausible to understand statements about the photograph as also statements about the individuals performing the gesture.

2

The alumni have not plausibly alleged that the other disputed statements—ones not about the salute photograph—refer to them individually.

The alumni allege that the *Post* falsely connected the salute-photo controversy with the robe controversy and falsely implied that fraternity members wore hooded robes. J.A. 37–38. The article discussed both controversies, stated that Kappa Gamma student members had worn hooded robes in the past, and reported that "recent photos" showed other student members "in the outfits again." *Id.* at 105, 108. But the *Post* did not state that the plaintiffs themselves had worn robes. And its article stated that the salute photo—in which none of the photographed students was robed—"resurfaced around the same time members were caught wearing the robes." *Id*. at 105. The time referenced was around 2020, some three decades after the plaintiffs had left Gallaudet. So, readers could not reasonably think that the members "caught wearing the robes" included the plaintiffs.

The alumni further allege that Cordano and the *Post* falsely asserted that the Kappa Gamma suspension was based on new information or a new photograph. J.A. 44, 56. True, Cordano stated that she had received "new information" calling attention to Kappa Gamma. *Id.* at 32. But this statement did not imply that she had any new information about the four plaintiffs. And Cordano later clarified that the new information involved Kappa Gamma's alleged "intention to bring back the use of

15

robes." *Id.* at 44.  Likewise, the alumni allege the *Post* implied that there were new photos of Kappa Gamma members wearing robes.  *Id.* at 38.  But the article neither stated nor implied that the plaintiffs were among those members.

B

To be actionable under D.C. defamation law, a statement must be both "defamatory" and "provably false."  *Competitive Enter. Inst.*, 150 A.3d at 1241.  A "defamatory" statement is one that makes the plaintiff appear "odious, infamous, or ridiculous."  *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984) (cleaned up).  To be "provably false," a statement must either be factual or, if framed as an opinion, must "imply a provably false fact or rely on facts that are provably false."  *Competitive Enter. Inst.*, 150 A.3d at 1242.  The First Amendment incorporates the same limitation.  *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990) ("a statement on matters of public concern must be provable as false before there can be liability under state defamation law"); *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776–78 (1986).

Applying these standards, we hold that the disputed statements about the salute photograph are non-actionable opinions.

1

Without more, politically charged epithets are often protected opinions lacking sufficient factual content to be provably false.  Our cases have made this point repeatedly for the terms "fascist" and "Marxist."  In *Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1563 (D.C. Cir. 1984), *rev'd on other grounds*, 477 U.S. 242 (1986), we had "no difficulty" concluding that the word "fascism," when used to express disapproval with political adversaries, was a protected

16

"statement of opinion." *Id.* at 1573; *see also Buckley v. Littell*, 539 F.2d 882, 894 (2d Cir. 1976). In *Ollman v. Evans*, 750 F.2d 970 (D.C. Cir. 1984) (en banc), we held that a charge of "Marxism" against a university professor was likewise protected opinion because it was "hopelessly imprecise and indefinite." *Id.* at 987–88. In *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287 (D.C. Cir. 1988), we reaffirmed that the "use of 'fascist' as a generic epithet" was not actionable. *Id.* at 1297. And in *Competitive Enterprise Institute*, the D.C. Court of Appeals agreed that calling someone a "fascist" was not actionable "due to the tremendous imprecision of the meaning and usage of th[is] term[] in the realm of political debate." 150 A.3d at 1248.[2]

In this case, statements describing the students in the salute photo as the "face of systemic racism" and "anti-Semitic" are likewise not actionable. In the abstract, "systemic racism" is a "hopelessly imprecise" phrase and is thus not provably false. *Ollman*, 750 F.2d at 987. And here, the charges of racism and anti-Semitism were based on the salute photograph, providing factual context that "readers can easily judge … for themselves." *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352 (3d Cir. 2020). Some observers might conclude that the continued use of a gesture that appears indistinguishable

---

[2] The alumni rely heavily on *Afro-American Publishing Co. v. Jaffe*, 366 F.2d 649 (D.C. Cir. 1966) (en banc), which held actionable a statement that the plaintiff, "by canceling his subscription" to the Washington Afro-American newspaper, "would appear to be a bigot." *Id.* at 665 (cleaned up). This statement that the cancellation was motivated by racial animus contained more factual content than a mere epithet. To the extent *Jaffe* further suggested that the use of "bigot" as an epithet is actionable, or cited with approval out-of-circuit precedent finding it "actionable to charge that one is pro-Nazi," *id.*, it has been overtaken by other binding decisions such as *Hepps*, *Ollman*, and *Competitive Enterprise Institute*.

17

from a Nazi salute, some 50 years after Congress prescribed a different gesture for the Pledge, warrants the harsh condemnation of loaded epithets. Others might conclude that the condemnation is unfair, given a tradition dating back not to Hitler and Mussolini, but to Francis Bellamy. Regardless, we are confident that the contested statements at issue here, although inflammatory, were not provably false.

2

The alumni also allege that Cordano and the *Post* stated or implied that the students in the photo performed a Nazi salute. They allege that Cordano signed a "version of a Bellamy salute" that "g[ave] the appearance" of a Nazi salute. J.A. 34. And they allege that the *Post* reported that the students in the photograph had performed an "apparent Nazi salute." *Id.* at 56–57. These statements are opinions based on facts not provably false. The parties agree that a Bellamy salute and a Nazi salute are at least similar in appearance. *Id.* at 22. In fact, the alumni do not identify any difference between them. And anyone inspecting the photograph—which is necessary to connect the epithets used to Costello and Millios—would easily recognize what are at a minimum obvious similarities.

III

For these reasons, we affirm the district court.

*So ordered.*

KAREN LECRAFT HENDERSON, *Circuit Judge*, concurring: I join my colleagues regarding the law that controls this case without reservation — but I do so with nose held. The highest-ranking official of a respected and public-spirited university serving specialized students for over 150 years has successfully deflected criticism and skirted responsibility in an apparently long-running controversy. And the fourth estate is once again — and under the law — blameless. The only parties to suffer are the alumni plaintiffs, whose antiquated gesture of fraternal allegiance — gratuitously publicized 35 years later — has most likely blighted the remainder of their lives.