UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

READE WHITNEY,

    *Plaintiff,*

v.

DC SOCCER, LLC,

    *Defendant.*

Civil Action No. 23-02988 (AHA)

**Memorandum Opinion**

Reade Whitney sues the D.C. United major league soccer club, also called DC Soccer, LLC, claiming the organization defamed him in a statement it released upon his termination. D.C. United moves to dismiss, arguing Whitney's complaint fails to state a claim. The court agrees and grants the motion.

**I.    Background**[1]

D.C. United hired Whitney as an athletic trainer in 2021 and promoted him to head trainer in 2022. ECF No. 1 ¶¶ 21, 23. According to the complaint, Whitney was successful in this role and "enjoyed a reputation as an excellent, inclusive, and professional soccer athletic trainer with the players and staff of D.C. United." *Id.* ¶ 25.

In 2023, Whitney took part in a photoshoot in D.C. for the major league soccer all-stars team and staff. *Id.* ¶ 28. D.C. United posted many photos from the event on social media and, in one of them, Whitney "made an upside-down 'OK' hand gesture below his waist." *Id.* ¶¶ 29, 31.

---

[1] As required at this stage, the court accepts the complaint's well-pled allegations as true and draws all reasonable inferences in Whitney's favor. *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015).

The hand gesture quickly became an online topic of conversation, with comments debating whether Whitney "flashed a racist hand signal" or "was instead playing something known as the Circle Game." *Id.* ¶¶ 33–35. Whitney alleges he and the staff member who informed him of the comments were surprised to learn the hand gesture could be construed as racist. *Id.* ¶¶ 36–37.

The same day Whitney learned of the online comments, D.C. United's management and legal counsel told Whitney to join a video call, in which "D.C. United claimed that the photograph was problematic because the hand gesture could be construed by some as a white power signal." *Id.* ¶¶ 38–39. Whitney explained he did not know until that day that any variation of the hand gesture could be construed as racist or a signal of white power, and that he was playing a game, known as the "Circle Game," that other clubmates also played. *Id.* ¶¶ 40–42. About two hours later, the same executives told Whitney to join another call, this time with a human resources employee present as well. *Id.* ¶ 44. On that call, D.C. United told Whitney they had "completed an investigation" and were firing him. *Id.* ¶ 45. Around half an hour later, D.C. United issued a statement that read:

> D.C. United have terminated the employment of the club's athletic trainer effective immediately.
>
> This termination is the result of an internal review following the discovery of a discriminatory hand gesture made by the individual that surfaced in a photograph published across social media platforms on July 20, 2023.
>
> There is no place for racism, homophobia, misogyny, or discrimination of any kind in our sport and world and D.C. United do not tolerate any acts of this nature.

*Id.* ¶ 49.

The club's statement "went viral on local news, national news, international news, and the internet, including articles by National Public Radio, the BBC, and Associated Press," and a *Washington Post* article quickly identified Whitney as the athletic trainer at issue. *Id.* ¶¶ 51–52. Some comments on the *Washington Post* article speculated that the team or league must have

determined Whitney knew the gesture could be construed as racist, while other comments stated or implied that Whitney was a racist. *Id.* ¶¶ 53–61.

According to the complaint, the Anti-Defamation League recognizes the "okay" hand gesture as "an obvious and ancient gesture that has arisen in many cultures over the years with different meanings," including innocuous ones. *Id*. ¶¶ 65–70. The gesture "most commonly signals understanding, consent, approval or well-being" and is "associated with the word 'okay' and its abbreviation 'ok.'" *Id.* ¶¶ 66–67. But, in recent years, the gesture has also been used by some as a symbol of "white power" and identified "as a potential hate symbol." *Id.* ¶¶ 71–72. At the same time, "similar-seeming hand gestures have also been mistakenly assumed to have white supremacist connotations," including the gesture used in "the so-called 'Circle Game,' in which people attempt to trick each other into looking at an okay-like hand gesture made somewhere below the waist." *Id.* ¶ 74.

According to Whitney, he was playing this "Circle Game," the gesture from which is "regularly used to photobomb otherwise serious photographs" and differs from the sometimes-racist gesture because it is "upside-down and backwards" and "held below the waist." *Id.* ¶¶ 77–79. Whitney alleges that D.C. United's statement "falsely and directly implied that [he] was associated with racism, homophobia, misogyny, and discrimination," *id.* ¶ 64, tarnishing his reputation, destroying his ability to earn a living, and causing emotional damage, *id.* ¶¶ 105–108, 111–115. Whitney alleges he has no history of racism, white supremacy, homophobia, misogyny, or other discrimination and is a "lifelong anti-racist." *See id.* ¶¶ 80–85, 88, 90–93.

Whitney filed this suit, asserting D.C. United defamed him. After D.C. United moved to dismiss, the parties agreed to stay the case pending the D.C. Circuit's resolution of *Florio v.*

*Gallaudet Univ.*, 119 F.4th 67 (D.C. Cir. 2024). The circuit has since issued its decision in that case, and D.C. United renewed its motion to dismiss. ECF No. 15.

**II.   Discussion**

To survive dismissal for failure to state a claim, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The court "must take all the factual allegations in the complaint as true," though it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

Whitney has not stated a defamation claim. To do so, a plaintiff must allege "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement met the requisite standard; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Florio v. Gallaudet Univ.*, 119 F.4th 67, 73 (D.C. Cir. 2024) (quoting *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1240 (D.C. 2016) (cleaned up)).[2] The statement "must be both 'defamatory' and 'provably false.'" *Id.* at 77 (quoting *Competitive Enter. Inst.*, 150 A.3d at 1241).

---

[2]   Whitney sues for both "defamation" and "defamation per se." ECF No. 1 ¶¶ 135–165. Because, as discussed below, the court dismisses for failure to allege a provably false statement, the court need not separately address Whitney's claim for defamation per se, which differs from a defamation claim only with respect to whether special damages must be alleged. *See KLEO AG v. Rivada Networks, Inc.*, 148 F.4th 741, 745 (D.C. Cir. 2025) (noting that a plaintiff suing for defamation can either "allege that the challenged statements were so inherently harmful that they were defamatory per se, in which case no additional showing of damages is required," or allege "special damages").

"To be 'provably false,' a statement must either be factual or, if framed as an opinion, must 'imply a provably false fact or rely on facts that are provably false.'" *Id.* (quoting *Competitive Enter. Inst.*, 150 A.3d at 1241 (cleaned up)). In determining whether a statement is factual or opinion that implies or relies on a provably false fact, the court considers the "context of the entire document in which" the statement appears and "the context in which the document containing the allegedly defamatory [statement] is published." *Sigal Const. Corp. v. Stanbury*, 586 A.2d 1204, 1210 (D.C. 1991).[3]

Here, Whitney has not alleged that D.C. United made a false and defamatory statement about him; rather, D.C. United's statement is nonactionable opinion about whether Whitney made a discriminatory gesture. The D.C. Circuit's recent opinion in *Florio*, 119 F.4th 67, is instructive. There, former members of the Kappa Gamma fraternity at Gallaudet University had been

---

[3]   The parties appear to disagree over whether D.C. or Virginia defamation law applies, although neither offers any meaningful analysis of choice of law principles. In a diversity jurisdiction case like this, the court applies "tort law of the jurisdiction that has the most significant relationship to the dispute," considering "where the injury occurred, where the conduct causing the injury occurred, the domicile, residence, nationality, place of incorporation and place of business of the parties, and the place where the relationship is centered." *Wu v. Stomber*, 750 F.3d 944, 949 (D.C. Cir. 2014) (quotation marks and citation omitted). Here the complaint indicates D.C. United does business in D.C. and Whitney resides in Virginia, and the remaining factors appear to favor applying D.C. law, including the location of the photoshoot and the parties' relationship being centered around Whitney's employment with the D.C. soccer club. ECF No. 1 ¶¶ 1, 3, 7, 21, 23, 28. Indeed, the complaint specifically alleges "a substantial part of the events giving rise to the claim occurred in the District of Columbia." *Id.* ¶¶ 7, 8. Accordingly, the court applies D.C. law.

In any event, neither party identifies a difference between D.C. and Virginia law that would affect the outcome of this case. Whitney recognizes that D.C. and Virginia defamation laws "are similar but not identical." ECF No. 16 at 3; *see also Sigal*, 586 A.2d at 1208 (observing "there are few discernible differences between Virginia and District of Columbia defamation law"). Moreover, as relevant here, to be actionable under Virginia law, as under D.C. law, a statement must be both defamatory and provably false. *See Tharpe v. Saunders*, 737 S.E.2d 890, 892 (Va. 2013) (recognizing that under Virginia law, a statement is actionable only if it is "both false and defamatory"); *id.* at 893 ("Speech that does not contain a provably false factual connotation is generally considered pure expression of opinion" and "cannot form the basis of a defamation action" (cleaned up)).

"photographed together performing the Bellamy salute, which was created in the late 19th century for the Pledge of Allegiance" but "now also resembles the Nazi salute." *Id.* at 70. The university president suspended the fraternity, describing it "as the 'face of systemic racism' at Gallaudet." *Id.* at 70–71. The *Washington Post* published articles repeating the president's statement, with headlines like "Gallaudet University suspends fraternity after anti-Semitic photo resurfaces" and "Photos involving Nazi salute, KKK-style garb seal Kappa Gamma's fate." *Id.* at 71–72 (citation omitted). The articles described the photo as showing alumni of the fraternity "performing an apparent Nazi salute." *Id.* at 72 (citation omitted). Alumni sued both the university and the *Washington Post* for defamation.

The D.C. Circuit held that the statements were "protected opinions." *Id.* at 70. The plaintiffs alleged the defendants "stated or implied that the students in the photo performed a Nazi salute." *Id*. at 78. The circuit explained that the statements were "opinions based on facts not provably false" because "a Bellamy salute and a Nazi salute are at least similar in appearance" and "anyone inspecting the photograph" would "easily recognize what are at a minimum obvious similarities." *Id.* The circuit also held that "statements describing the students in the salute photo as the 'face of systemic racism' and 'anti-Semitic'" were non-actionable opinion. *Id*. at 77. It reasoned that "the charges of racism and anti-Semitism were based on the salute photograph, providing factual context that readers can easily judge for themselves." *Id.* at 77–78 (cleaned up) (quoting *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 357 (3d Cir. 2020)). Some observers might conclude the use of the gesture "warrants the harsh condemnation of loaded epithets," while others "might conclude that the condemnation is unfair." *Id*. at 78.

The same is true here. To the extent the organization's statement that it fired Whitney after "an internal review following the discovery of a discriminatory hand gesture made by [Whitney]

6

that surfaced in a photograph" implies that Whitney made the discriminatory version of the hand gesture, as opposed to an innocuous "okay" or "Circle Game" gesture, it is opinion that is not provably false. ECF No. 1 ¶ 49. Just as in *Florio*, these hand gestures are at least similar in appearance. *See id.* ¶ 74 (alleging that the "okay-like" gesture used in the "Circle Game" is one of the "similar-seeming hand gestures" that have "been mistakenly assumed to have white supremacist connotations"); *id.* at ¶ 31 (acknowledging Whitney "made an upside-down 'OK' hand gesture below his waist"); *id.* at ¶¶ 36–37 (describing Whitney's gesture as a "variation of the OK hand gesture"). And as in *Florio*, the statement was based on a photograph from which observers could draw their own opinions. *See id.* ¶¶ 34–35 ("Someone online suggested that Reade Whitney had flashed a racist hand signal. Someone else online suggested that Reade Whitney was instead playing something known as the Circle Game."). Similarly, to the extent D.C. United's statement that "[t]here is no place for racism, homophobia, misogyny, or discrimination of any kind in our sport and world and D.C. United do not tolerate any acts of this nature," *id.* ¶ 49, can be read to suggest Whitney's gesture was racist or otherwise prejudiced, that was nonactionable opinion "based on the [gesture] photograph, providing factual context that readers can easily judge for themselves," *Florio*, 119 F.4th at 77–78 (cleaned up) (quoting *McCafferty*, 955 F.3d at 357).[4]

Whitney argues *Florio* is "completely distinguishable on the facts" in two ways. ECF No. 16 at 12. First, he argues the gesture in the photograph at issue in *Florio* was "by then decades

---

[4] Whitney argues that, even if D.C. United's mention of discrimination and racism was nonactionable opinion, it "did not have any basis to publish a statement" associating him with homophobia and misogyny. ECF No. 16 at 9. But the statement at issue was framed as an articulation of D.C. United's general values—that "[t]here is no place for racism, homophobia, misogyny, or discrimination of any kind" and "D.C. United do not tolerate any acts of this nature." ECF No. 1 ¶ 49. And to the extent that statement implies anything about Whitney's use of the hand gesture in the photograph, Whitney does not explain how a statement that implies the gesture is homophobic or misogynistic is any less a nonactionable opinion than the statement that it is discriminatory or racist.

suspect" because of its similarity to the Nazi salute, the photo had been taken long before the statements about it were made, and the case arose after a "series of events, at a university community, over a long period of time" and therefore there was "much to comment on, much to opine about." *Id.* at 12–13. But Whitney does not cite any legal authority for why these facts are material, and it's hard to see why they would be. Second, Whitney argues that the nefarious meaning of the "okay" gesture is less "widely known" than the salute in *Florio*, that the "okay" gesture is more often used innocuously, and that Whitney used the modified "upside down, backwards, and below the waist" variation of the gesture that is commonly used in the "Circle Game." *Id.* at 13; *see* ECF No. 1 ¶¶ 78–79. Even accepting these allegations as true, however, the critical question is whether D.C. United's statement that Whitney's gesture is "a discriminatory hand gesture" is opinion based on facts that are provably false. ECF No. 1 ¶ 49. The answer to that question does not turn on how widely known the gesture's discriminatory meaning is or how often the gesture is used innocuously. And while it is true that Whitney alleges differences between the white power hand signal and the gesture he made, Whitney also expressly acknowledges the similarities between the gestures. As in *Florio*, the question of which gesture Whitney was making is one readers can judge for themselves; some might—and, according to the allegations, did— conclude the use of the gesture "warrants the harsh condemnation of loaded epithets," while others might—and, according to the allegations, did—"conclude that the condemnation is unfair." *Florio*, 119 F.4th at 78; *see* ECF No. 1 ¶¶ 34–35.[5]

---

[5] To be sure, Whitney's allegations that his hand gesture differed in some ways from the white power symbol, that he is anti-racist, and that he has never supported homophobia or misogyny may be reasons to think that Whitney did not intend his hand gesture to be discriminatory. ECF No. 1 ¶¶ 78–79, 88, 90, 93. But those facts do not render D.C. United's opinion about the gesture provably false.

Whitney also argues D.C. United's statement is factual, and not an opinion, because D.C. United did not use language that explicitly framed its statement as opinion—for example, it did not say the gesture "might have been" or "in the opinion of DC United" was discriminatory. ECF No. 16 at 6–7. To be sure, that a statement is "cautiously phrased in terms of apparency" may make it "less likely to be understood as a statement of fact rather than as a statement of opinion." *Ollman v. Evans*, 750 F.2d 970, 977 n.12 (D.C. Cir. 1984) (citation omitted). But the use of such language is not determinative one way or the other. *See Competitive Enter. Inst.*, 150 A.3d at 1245 n.38 (recognizing that the "absence of such language" is but "one indication of how the [statement] would come across to the reader"); *Ollman*, 750 F.2d at 985 n.31 (concluding that the presence of "language of apparency" did not convert the statement to opinion based on the context). D.C. United's interpretation of the gesture here is not rendered factual merely because D.C. United did not say it was stating an opinion. Indeed, the statements in *Florio* were held nonactionable even though some did and some did not contain language of apparency. *See Florio*, 119 F.4th at 72 (noting statement that there was a photo showing "an apparent Nazi salute" and statement that there were "[p]hotos involving Nazi salute").

Lastly, Whitney argues that, even if D.C. United was expressing an opinion, its statement that his termination resulted from "an internal review" makes the opinion actionable because it "impl[ies] an assertion of objective fact." ECF No. 16 at 7 (quotation marks and citation omitted). Whitney is correct that "statements of opinion can be actionable if they imply a provably false fact, or rely upon stated facts that are provably false." *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 597 (D.C. 2000); *see Florio*, 119 F.4th at 77 (noting that to be actionable, an opinion "must 'imply a provably false fact or rely on facts that are provably false'" (quoting *Competitive Enter. Inst.*, 150 A.3d at 1241 (cleaned up))). But here, D.C. United's statement that it conducted an

9

"internal review" does not imply any fact that is provably false. At most, as Whitney himself puts it, D.C. United "publicly communicated to the world that some sort of investigation was conducted which resulted in termination of employment." ECF No. 16 at 7. The statement does not, as Whitney further argues, imply that D.C. United discovered some objective fact confirming that the gesture was discriminatory. Indeed, Whitney does not identify what that objective fact would be. And the statement itself points readers to the "hand gesture made by [Whitney] that surfaced in a photograph published across social media platforms." ECF No. 1 ¶ 49; *see also Cooper v. Templeton*, 629 F. Supp. 3d 223, 236 (S.D.N.Y. 2022) (noting statement that defendants performed an "internal review" of an incident "did not indicate or even imply that they considered any information not already known to the public"). The statement, taken as a whole, expresses the club's opinion that Whitney made a discriminatory hand gesture in the photo, which is not provably false. The court accordingly concludes that the complaint fails to allege any factual statement or opinion implying a provably false fact.

### III. Conclusion

For these reasons, the court grants D.C. United's second motion to dismiss, ECF No. 15, and dismisses the case without prejudice. A separate order accompanies this memorandum opinion.

_____
AMIR H. ALI
United States District Judge

Date:   January 7, 2026